**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**VILLAGE OF CASEYVILLE, ILLINOIS, KELLER PROPERTIES, LLC, and KELLER FARMS, INC.,**

**Plaintiffs,**

**v.**

**CSX TRANSPORTATION, INC., and BALTIMORE & OHIO RAILROAD COMPANY,**

**Defendants.**

**Case No. 3:24-CV-02164-NJR**

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This case arises out of a major flooding event in Caseyville, Illinois. Plaintiffs, the Village of Caseyville, Illinois ("Caseyville"), Keller Properties LLC, and Keller Farms, Inc. ("Keller Properties" and "Keller Farms" respectively; collectively the "Kellers"), allege that Defendants, CSX Transportation, Inc. ("CSX") and Baltimore & Ohio Railroad Company ("B&O"), caused or intensified the flooding because they improperly maintained their property. Specifically, Plaintiffs allege that, over time, debris had built up on Defendants' property behind a bridge crossing over Little Canteen Creek, which obstructed the creek's natural flow of water. When a storm hit, water was diverted over the banks of the creek, causing a "massive surge of water" through Caseyville that "damage[ed] entire neighborhoods." Compl. ¶ 1, (Doc. 1-1).

Plaintiffs filed a complaint in the Circuit Court of St. Clair County, Illinois, on July

24, 2024. The complaint asserts two counts of negligence, one on behalf of Caseyville (Count I) and one on behalf of the Kellers (Count II). Defendants removed the case to federal court on September 12, 2024.[1] (Doc. 1). They now move to dismiss Plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6). (Doc. 13).

## FACTUAL BACKGROUND

On the night of July 25 and into July 26, 2022, a "massive surge of water" rushed through Caseyville. Compl. ¶ 1. Plaintiffs and residents of Caseyville suffered "immeasurable losses" as entire neighborhoods were damaged *Id.* ¶¶ 1, 17.

The surge was allegedly caused by "countless gallons of water that became bottled up" on Defendants' property behind a railroad bridge crossing over Little Canteen Creek. *Id.* ¶ 2. Water allegedly built up because debris had accumulated in the area over time, eventually "clog[ging]" the creek's natural flow. *Id.* When a storm hit on July 25, water

[1] Federal subject matter jurisdiction is secure under the diversity statute, which requires opposing parties to be "citizens of different [s]tates" and an amount in controversy exceeding $75,000 exclusive of interest and costs. 28 U.S.C. § 1332(a). Caseyville is an Illinois municipality, and thus a citizen of Illinois. (Am. Not. of Removal, Doc. 40, p. 2). Keller Properties is an Illinois citizen because, as a limited liability company, it adopts the citizenship of its members—Craig Keller, Lindsey Keller-Janssen, and Lauren Eck—all of whom are citizens of Illinois. (*Id.*); *see also City of E. St. Louis, Ill. v. Netflix, Inc.*, 83 F.4th 1066, 1070 (7th Cir. 2023) (explaining citizenship rule for limited liability companies). Keller Farms is also an Illinois citizen because it is incorporated and has its principal place of business in Illinois. (Doc. 40, p. 2); *see also* 28 U.S.C. § 1332(c)(1). CSX is a citizen of Virginia and Florida because it is incorporated in Virginia and has its principal place of business in Jacksonville, Florida. (Doc. 40, p. 2). B&O merged into The Chesapeake & Ohio Railway Co. in April 1987, which then merged into CSX in September 1987. B&O thus "has no active railroad operations and no longer exists as a distinct entity subject to legal process." (Doc. 13 n.1). This satisfies complete diversity because Plaintiffs are Illinois citizens and Defendants are Virginia and Florida citizens. The amount in controversy requirement also appears to be met because Plaintiffs allege "immeasurable losses" and seek "massive amounts of money" in damages as a result of a flood that damaged "entire neighborhoods." (Doc. 1-1); *see also Sykes v. Cook Inc.*, 72 F.4th 195, 205 (7th Cir. 2023) ("The plaintiff's allegations about the amount in controversy control unless the court concludes, to a legal certainty, that the face of the pleadings demonstrates that the plaintiff cannot recover the jurisdictional minimum or that the proofs show that the plaintiff never was entitled to recover that amount.") (internal quotation marks omitted).

levels swelled over the banks of the creek and put stress on the creek's levees. *Id.* ¶¶ 3, 15. Eventually, the south levee failed, "creating a gap . . . the size of a greyhound bus," which "unleash[ed] a huge amount of water over the adjacent farmland" and into Caseyville. *Id.* ¶¶ 16, 17.

The bridge on Defendants' property is located northwest of Caseyville's residential neighborhoods. *Id.* ¶ 34. "Major flooding" allegedly reached Old Caseyville Road, Susanne Court, Lucinda Court, 5th Street, 6th Street, 7th Street, Acordi Drive, Countryside Drive, West Lincoln Avenue, and Black Lane. *Id.* ¶ 50. The flood also forced the Caseyville Nursing and Rehabilitation Center to evacuate its residents to ensure their safety. *Id.* ¶ 51. More broadly, the flood allegedly caused "widespread destruction throughout Caseyville." *Id.* ¶ 57. Caseyville was placed under a "federal state of emergency," which required it to "expend massive amounts of money . . . to have emergency responders active and remediation crews address the issues to solve the problems created by the flood." *Id.* ¶ 58. The Kellers, for their part, own farmland near Defendants' property, where they grow and harvest crops. *Id.* ¶¶ 36-37. When the south levee failed, water rushed onto the Kellers' property "destroying all of [their] crops" south of the levee. *Id.* ¶¶ 37, 71.

Defendants allegedly knew that debris could create a "makeshift dam" because it had happened before. *Id.* ¶ 5. Nevertheless, Defendants failed to "fix, adjust, redesign, or make any improvements on the land of the [b]ridge to prevent debris collection since at least 1996." *Id.* ¶ 8. Indeed, it had been 40 years since Defendants last cleaned debris around the bridge. *Id.* ¶ 10. Defendants, moreover, did not communicate with Caseyville

police and first responders in advance of the storm, nor did they warn the residents of Caseyville about the allegedly dangerous condition that existed on their property and that could create a flood. *Id.* ¶¶ 11, 13.

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). The Court accepts as true the complaint's well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *Burke v. 401 N. Wabash Venture, LLC,* 714 F.3d 501, 504 (7th Cir. 2013).

To survive a Rule 12(b)(6) motion, a plaintiff only needs to allege enough facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Plausibility does not mean probability: a court reviewing a 12(b)(6) motion must 'ask itself *could* these things have happened, not *did* they happen.'" *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 833 (7th Cir. 2015) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)). "A claim is plausible where a plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This means that the plaintiff must offer "some specific facts to support the legal claims asserted in the complaint." *Id.* (quoting *McAuley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citation modified)).

A complaint, moreover, "need not anticipate or refute potential affirmative defenses." *Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th 636, 640 (7th Cir. 2022).

Affirmative defenses are thus generally resolved in a motion for judgment on the pleadings under Rule 12(c), not in a motion to dismiss under Rule 12(b)(6). *Holmes v. Marion Cnty. Sheriff's Off.*, 141 F.4th 818, 822 (7th Cir. 2025). Dismissal on the basis of an affirmative defense under Rule 12(b)(6) is only appropriate "if the affirmative defense is clear from the face of the complaint." *Id.*; *see also H.A.L. NY Holdings, L.L.C. v. Guinan*, 958 F.3d 627, 631-32 (7th Cir. 2020). So, "[o]nly when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). And when an affirmative defense is raised in a motion to dismiss under Rule 12(b)(6), the defendant bears the burden of proof. *Benson v. Fannie Mae Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019).

**Discussion**

Defendants raise five arguments in support of their motion to dismiss. First, they argue that Illinois' municipal cost recovery rule bars Caseyville from recovering its emergency response costs. Second, they contend that Plaintiffs' claims are barred by the economic loss doctrine. Defendants' third and fourth arguments contend that Plaintiffs' claims are preempted by the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10101, *et seq.* ("ICCTA"), and the Federal Railroad Safety Act, 49 U.S.C. § 20101, *et seq.* ("FRSA") respectively. And finally, they argue that Plaintiffs failed to plead a legally cognizable duty to support their negligence claims. The Court will address each of these arguments in turn.

1. Municipal Cost Recovery

The municipal cost recovery rule holds that "public expenditures made in the performance of governmental functions are not recoverable in tort." *City of Chicago v. Beretta U.S.A., Corp.*, 821 N.E.2d 1099, 1144 (Ill. 2004). This means that "the cost of public services for protection from fire or safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service." *Id.* (quoting *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 323 (9th Cir. 1983)). The Illinois Supreme Court adopted this rule in *Beretta* as an outgrowth of the separation of powers doctrine:

> Governmental entities themselves currently bear the cost in question, and they have taken no action to shift it elsewhere. If the government has chosen to bear the cost for reasons of economic efficiency, or even as a subsidy to the citizens and their businesses, the decision implicates fiscal policy; the legislature and its public deliberative processes, rather than the court, is the appropriate forum to address such fiscal concerns.

*Id.* at 1144-45 (quoting *Flagstaff*, 719 F.2d at 324 (citation modified)). The Illinois legislature, for its part, has passed no law modifying this rule. *Id.* at 1147. Thus, under Illinois law, municipal and other governmental claimants are barred from recovering the costs they incur in responding to certain emergencies and disasters.

Defendants invoke the rule to knock out Caseyville's claim for damages based on its expenditure of "massive amounts of money . . . to have emergency responders active and remediation crews address the issues to solve the problems created by the flood." A straightforward application of the rule shows they are correct.

The Ninth Circuit's decision in *Flagstaff*—on which the Illinois Supreme Court

relied in *Beretta*—offers an instructive framework. There, a train carrying liquified petroleum gas derailed near Flagstaff, Arizona, creating a public safety hazard. *Flagstaff*, 719 F.2d at 323. The City of Flagstaff sought to recover its costs for the "evacuation [of affected residents], including overtime pay, emergency equipment, emergency medical personnel," and other remedial expenses under a negligence theory. *Id.* But the remedial services at issue, the court found, were "provided by the government and the costs . . . spread by taxes." *Id.* Thus, "the tortfeasor does not expect a demand for reimbursement" from the government even though it may be liable to *private parties* whose injuries it proximately caused. *Id.* The court found that imposing damages on the defendant for Flagstaff's remedial expenditures would upset "[s]ettled expectations" that governmental services are paid for by the government. *Id.* This is so because, unlike a private party, the government "spreads the expense of emergency services to its taxpayers, an allocation which is neither irrational nor unfair." *Id.* Here, Caseyville seeks to recover a nearly identical form of damages as Flagstaff: "money . . . to have emergency responders active and remediation crews address the issues" caused by the flood. Under *Beretta*, the Court is in no position to award damages for these expenditures because they are covered by the municipal cost recovery rule.

Caseyville acknowledges that it cannot recover the costs associated with "taxpayer funded services for police and fire emergency personnel conducting rescue efforts." Caseyville Resp. to MTD, (Doc. 31, p. 2). But in its response to Defendants' motion to dismiss, Caseyville shifts the damages inquiry to the "hundreds of thousands of dollars expended by [it] when it (1) repaired and/or replaced personal property, (2) repaired

village owned real property, (3) repaired the levee owned, controlled and located on private property, and (4) provided non-traditional services not normally provided by the Village to residents and members of the general public." *Id.* Caseyville is correct that it may, at a minimum, recover for damage to *its own* property. A governmental entity, after all, stands in the same position as any other tort plaintiff when it seeks compensation "for harm to [its] property." *Beretta*, 821 N.E.2d at 1147; *see also Flagstaff*, 719 F.2d at 324 (damages available "where the government incurs expenses to protect its own property"). But if Caseyville sustained such losses, they are nowhere to be found in the complaint.

Caseyville alleges "immeasurable losses," "widespread destruction," and that the flood reached several of its streets. These allegations are too general to withstand the municipal cost recovery rule. Indeed, the only specific allegation concerning the destruction of property concerns property belonging to *the Kellers*—namely, crops that were destroyed when the south levee failed. Perhaps in recognition of this pleading defect, Caseyville's response brief pivots to its expenditures to repair "village owned property" and other items. While these types of damages may be compensable—if properly pled—their absence from the complaint is fatal to Caseyville's claim. "It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Agnew v. NCAA*, 683 F.3d 328, 348 (7th Cir. 2012) (alteration omitted); *see also Pirelli Armstrong Tire Corp. Retiree Med. Ben. Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011) (rejecting plaintiff's attempt to "reorient[]" allegations in response to motion to dismiss because of "the axiomatic rule that a plaintiff may not amend his

complaint in his response brief."). Accordingly, Caseyville's attempt to shift the inquiry to damages that were not pled is unconvincing because the Court is not interested in blurring the lines between the complaint and dispositive motion briefing.

The municipal cost recovery rule bars Caseyville from recovering the costs it incurred to respond to the flood. The complaint, moreover, does not allege any "specific facts" that support a claim for damages beyond the rule's reach. *Bilek*, 8 F.4th at 586; *see also In re Chicago Flood Litig.*, 680 N.E.2d 265, 276 (Ill. 1997) ("The conclusory allegation of unspecified property damage is insufficient to show that [plaintiffs'] damages are recoverable in tort."). Accordingly, Count I of Plaintiffs' complaint is dismissed without prejudice.

The Court will now consider Defendants' remaining arguments only with respect to Count II—the Kellers' negligence claim.

2. <u>Economic Loss</u>

Defendants attack the Kellers' negligence claim on the basis that they seek compensation in tort for purely economic damages. Such damages, they argue, are not recoverable under Illinois' economic loss doctrine.

"At common law, solely economic losses are generally not recoverable in tort actions" because "the economic consequences of any single accident are virtually limitless." *Chicago Flood*, 680 N.E.2d at 274. "[A] defendant who could be held liable for every economic effect of its tortious conduct would face virtually uninsurable risks, far out of proportion to its culpability." *Beretta*, 821 N.E.2d at 1140. The economic loss doctrine "operates to prevent such open-ended tort liability." *Id.*

But the doctrine is subject to an important exception. It does not apply where the plaintiff sustained "personal injury or property damage, resulting from a sudden or dangerous occurrence."[2] *Chicago Flood*, 680 N.E.2d at 275 (emphasis omitted). The Illinois Supreme Court explained the distinction between qualifying and non-qualifying damages under the economic loss doctrine as follows:

> [C]lass plaintiffs do not seek damages for the loss of continuous electrical service, which is a disappointed commercial expectation. Rather, class plaintiffs seek damages for property loss, in the form of lost perishable inventory, as a result of a tortious event. Such damages are above and beyond class plaintiffs' disappointed commercial expectation in continuous electrical service. Thus, these losses fall outside the definition of economic loss and are recoverable in tort.

*Id*. at 276 (internal citation omitted).

Here, Defendants focus on the allegations that "entire neighborhoods" were damaged, and that Plaintiffs spent "massive amounts of money" to respond to the flood. (Doc. 14, p. 6). These generalized allegations, they argue, are purely economic in nature, and thus subject to the economic loss doctrine.

The Court disagrees. Defendants' argument cherry-picks only certain allegations in the complaint while ignoring those most relevant to the issue of whether the Kellers have alleged cognizable damages to support their negligence claim. The Kellers allege that their crops were destroyed by the flood. The flood, moreover, was a "sudden, dangerous, or calamitous" event, as laid out in the complaint. Under *Chicago Flood*, these

[2] The Illinois Supreme Court also recognizes two other exceptions to the economic loss doctrine that are not relevant here: "where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.*, fraud;" and "where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions." *Chicago Flood*, 680 N.E.2d at 275 (internal citations omitted).

damages escape the economic loss doctrine. Indeed, *Chicago Flood* held that "lost perishable inventory" was not subject to the doctrine when a flood caused the loss. *Id.* Logically, then, the same applies to crops that were destroyed in the same manner.

Defendants also contend that the Kellers have not explained which of their losses are attributable to Keller Properties and which were sustained by Keller Farms. This argument too, is unconvincing because the complaint refers to the Kellers collectively and alleges that they suffered "the destruction of all of [their] crops" south of the south levee.[3] Compl. ¶¶ 18, 71. An indulgent review of the complaint, to which the Kellers are entitled, permits an inference that Keller Properties and Keller Farms both had an interest in the crops that were destroyed. The exact measure of their damages is an appropriate topic for discovery. *See e.g.*, *Bolden-Gardner v. Liberty Mut. Ins. Co.*, No. 19-3199, 2021 WL 22419, at *4 (D. Md. Jan. 4, 2021) (denying dispositive motion as premature where "there remains a dispute as to the nature and extent of the Plaintiffs' injuries, and by extension the value of their claimed damages."). Accordingly, Illinois' economic loss doctrine does not justify dismissal at this stage of the case.

3. Federal Preemption

Defendants next argue that the Kellers' negligence claim is preempted by federal law. They invoke the ICCTA and FRSA as federal statutes that broadly govern railroad transportation and thus leave no room for state regulation, including through tort

[3] The complaint refers to the Kellers as a single entity and thus alleges in paragraph 71 that "Keller" suffered "the destruction of all of *its* crops." This linguistic preference does not change the fact that the complaint names Keller Properties and Keller Farms (two separate legal entities) as Plaintiffs. The Court thus refers to them as the "Kellers" to convey their distinct legal personalities.

litigation. Federal preemption "is an affirmative defense upon which the defendants bear the burden of proof." *Benson*, 944 F.3d at 645 (internal quotation marks omitted).

*a. ICCTA Preemption*

The ICCTA is a modern example of Congress's "broad regulatory authority over rail transportation." *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 102 (2d Cir. 2009). Congress enacted the ICCTA in 1995 and created the Surface Transportation Board ("STB" or "Board") to administer it. *Union Pac. R.R. Co. v. Chicago Transit Auth.*, 647 F.3d 675, 678 (7th Cir. 2011) ("*CTA*"). "The STB is vested with broad jurisdiction over 'transportation by rail carriers.'" *Island Park*, 559 F.3d at 102 (quoting 49 U.S.C. § 10501(b)(1)). Congress gave the STB this broad regulatory mandate because it recognized that state regulation of rail transport risked the "balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation." *Iowa, Chicago & E. R.R. Corp. v. Wash. Cnty., Iowa*, 384 F.3d 557, 559 (8th Cir. 2004) (quoting H.R. REP. NO. 104-311, at 96 (1995)). And to help the STB execute its mandate, the ICCTA includes the following express preemption provision:

> The jurisdiction of the Board over--
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part, the remedies

> provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b). "Congress's intent in the [ICCTA] to preempt state and local regulation of railroad transportation has been recognized as broad and sweeping." *CTA*, 647 F.3d at 678.

There are two forms of preemption under the ICCTA: (i) categorical preemption; and (ii) as applied preemption. *Id.* at 679. "Categorical preemption occurs when a state action is preempted on its face despite its context or rationale, such as when state preclearance could be used to deny a railroad the ability to conduct some part of its operations, or when a state regulates matters directly regulated by the STB (*e.g.*, the construction, operation, and abandonment of rail lines)." *Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 894-95 (7th Cir. 2017) (citation modified). As applied preemption, on the other hand, depends on "the degree of interference that [the state action] has on railroad transportation—that is, if the action would have the effect of preventing or unreasonably interfering with railroad transportation." *Id.* at 895. Defendants' brief is unclear as to whether they rely on categorical preemption, as-applied preemption, or both, to support their argument that ICCTA preemption obtains. Either way, the Court is not persuaded that dismissal is appropriate at this stage.

Categorical preemption can itself be broken down into two forms. The first is "any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized." *CTA*, 647 F.3d at 679 n.3 (quoting *CSX Transp., Inc.*—

*Petition for Declaratory Order*, 2005 WL 1024490, at *2 (S.T.B. May 3, 2005)). The second is any "state or local regulation of matters directly regulated by the Board." *Id.* The complaint says nothing about "local permitting or preclearance" that could deny Defendants the ability to conduct their operations. Defendants do not claim otherwise. This case is about a natural disaster, which, the Kellers claim, was exacerbated by Defendants' failure to take care of their property. Nowhere do the Kellers allege that Defendants failed to obtain a permit or preclearance to operate in Illinois. Accordingly, the Kellers' negligence claim is not categorically preempted by a "local permitting or preclearance" requirement.

The Court is also unpersuaded that the Kellers' negligence claim, as pled, constitutes a regulation of matters "directly regulated by the Board." It is true that the complaint accuses Defendants of "fail[ing] to fix, adjust, redesign, or make any improvements on the land of the Bridge," and of failing to "regularly monitor and maintain" the area surrounding the bridge over Little Canteen Creek. Defendants view these allegations as an attempt to impose railway management requirements on them with respect to "the construction, operation, and abandonment of rail lines"—areas that are subject to categorical preemption. *Wedemeyer*, 850 F.3d at 895. But the Kellers were careful to focus their allegations on Defendants' "land," rather than their rail lines. They do not allege that the bridge was constructed in an unsafe manner or that Defendants' *operations* caused their injuries. So, another interpretation of the allegations in the complaint is that the Kellers simply want Defendants clean up debris on their property to reduce the risk of catastrophic flooding on adjoining properties. And with respect to

such activity, Defendants have cited no statutory or regulatory authority, suggesting that it is "directly regulated by the Board." This creates a problem for Defendants' categorical preemption argument because it is their burden to prove that the Kellers' negligence claim is preempted as pled. *See Rogers v. BNSF Ry. Co.*, No. 19 C 3083, 2019 WL 5635180, at *2 (N.D. Ill. Oct. 31, 2019) (rejecting ICCTA preemption argument in motion to dismiss because plaintiff's state law claim "imposes no limits or restrictions on the movement of property or persons.").

Based on the scant record available, the Court is unwilling to find that debris removal constitutes a regulation of rail transport that would trigger categorical preemption. Indeed, the Court struggles to see how the Kellers' request that Defendants clean up trash on their property "relate[s] to the movement of passengers or property, or both, by rail" at all. 49 U.S.C. § 10102(9)(A) (defining "transportation" under the ICCTA). And "where a tort claim is premised upon a railroad's activities on its property that have only a remote or incidental connection to 'rail transportation' or 'operation' of railroad tracks or facilities[] but rather are 'tortious acts committed by a landowner who happens to be a railroad company,' the claim is not expressly preempted by the ICCTA." *Benson v. Union Pac. R.R. Co.*, No. 2:08-cv-331, 2008 WL 2946331, at *4 (E.D. Cal. July 25, 2008) (quoting *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1130 (10th Cir. 2007)). If, after discovery, the Kellers' theory of liability is indeed based on Defendants' faulty construction and operation of its rail lines, or other matters "directly regulated by the Board," then Defendants may have a compelling argument for categorical preemption. But because the Kellers appear to focus on Defendants' role as a *property owner* rather

than a railway operator, the Court is not persuaded that they have pleaded themselves out of court by "admit[ting] all the ingredients of an impenetrable defense." *Xechem*, 372 F.3d at 901.

Finally, to the extent that Defendants argue that the Kellers' negligence claim is preempted as applied, that argument is similarly premature. As applied preemption depends on "the degree of interference that [a state action] has on railroad transportation." *Wedemeyer*, 850 F.3d at 895. This is a fact-sensitive inquiry because as applied preemption under the ICCTA happens on a sliding scale: "the more disruptive a claim is to a railroad's operations, the more likely it is to be preempted." *Ill. Dep't of Transp. v. Union Pac. R.R. Co.*, No. 3:24-CV-00614, 2024 WL 5007729, at *3 (S.D. Ill. Dec. 6, 2024). Here, the complaint does not reveal an attempt to interfere with Defendants' railroad operations; the Kellers simply want Defendants to clear debris from their property so that theirs may be spared future flooding. Discovery may, of course, expose the Kellers' negligence claim as unduly disruptive to Defendants' operations. And if that happens, the claim may be preempted as applied. But whether and, if so, how, Defendants' operations would be disrupted is anyone's guess at this point. Thus, the issue is not ripe for disposition under Rule 12(b)(6).

Other courts have reached similar conclusions when presented with ICCTA preemption arguments in a motion to dismiss. *See e.g.*, *Fleury v. Union Pac. R.R. Co.*, 528 F. Supp. 3d 885, 896 (N.D. Ill. 2021) (denying motion to dismiss state law claim based on ICCTA preemption because of "the dearth of facts" in the record); *Dawn Kehrer Revocable Tr. v. Norfolk S. Ry.*, No. 24-cv-1786, 2024 WL 5007781, at *5 (S.D. Ill. Dec. 6, 2024)

(recognizing that preemption under ICCTA and other federal statutes is a "fact-intensive inquiry not suitable for resolution on a Rule 12(b)(6) motion to dismiss."); *Smith v. CSX Transp., Inc.*, No. 14 C 5704, 2015 WL 350981, at *3 (N.D. Ill. Jan. 27, 2015) (rejecting ICCTA preemption argument in motion to dismiss because although plaintiffs' claims "may ultimately be preempted, that issue is more appropriately resolved on a fully developed factual record."); *cf. Rogers*, 2019 WL 5635180, at *3. The Court finds these cases instructive and declines to find the Kellers' negligence claim preempted by the ICCTA. Defendants will have an opportunity to raise the issue in a motion for summary judgment after the close of discovery.

*b. FRSA Preemption*

Defendants also invoke federal preemption under the FRSA as a basis for dismissal. Congress passed the FRSA "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The statute gives the Secretary of Transportation wide-ranging authority to "prescribe regulations and issue orders for every area of railroad safety." *Id.* § 20103(a). Moreover, beyond just promoting "safety" in railroad operations generally, "[l]aws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable." *Id.* § 20106(a)(1).

The FRSA contains an express preemption provision, which permits states to continue regulating "railroad safety" matters "until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." *Id.* § 20106 (a)(2); *see also Kehrer Revocable Tr.*, 2024 WL 5007781, at *6

(finding that FRSA's preemption provision "envisions the continuing validity of some state railroad safety laws."). Preemption under the FRSA is thus only triggered if a federal regulation "cover[s] the same subject matter" as a state requirement. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

So, what then does it mean for a federal regulation to "cover" the same subject matter as a state regulation? The Supreme Court answered that question in *Easterwood*: "To prevail on the claim that the regulations have preemptive effect," the party raising the preemption defense "must establish more than that they 'touch upon' or 'relate to' that subject matter." *Id.* "'[C]overing,'" the Court explained, "is a more restrictive term which indicates that preemption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Id.* Here, the issue is whether one or more federal railroad safety regulations, "cover the subject matter" of the Kellers' negligence claim.

Defendants cite several regulations related to the inspection and maintenance of railroad tracks to support their claim that federal standards "cover" the subject matter of the Kellers' negligence claim. 49 C.F.R. § 213.7(b) requires "track owner[s]" to "designate qualified persons to inspect track for defects," and specifies the qualifications that inspectors must demonstrate. 49 C.F.R. § 213.33 stipulates that "[e]ach drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned." 49 C.F.R. § 213.233 requires all tracks to be "inspected in accordance with [a specified] schedule" and demands "immediate[]" remedial action if a "deviation" is

found. 49 C.F.R. § 213.237 requires "internal rail inspections" in addition to those specified in § 213.233 to minimize "service failure rates." And finally, 49 C.F.R. § 213.239 states that "[i]n the event of fire, flood, severe storm, or other occurrence which might have damaged track structure, a special inspection shall be made of the track involved as soon as possible after the occurrence and, if possible, before the operation of any train over that track."

As the Court sees it, these regulations, at best, "touch upon" or "relate to" the Kellers' theory of liability. The complaint does not accuse Defendants of improperly constructing or maintaining their tracks or other equipment they rely on for their operations. Rather, it alleges that Defendants—as landowners—failed to take care of their property and, in doing so, exposed the Kellers to major flooding that damaged their crops. *That* matter is not "substantially subsumed" by the regulations Defendants cite. Their argument conflates regulatory standards governing *track* construction and maintenance with general property maintenance. And under this interpretation, these regulations would govern the maintenance of *all* real property that is owned by a railroad, regardless of its relationship or proximity to a track. That is a bridge too far. *See Norfolk S. Ry. Co. v. Box*, 556 F.3d 571, 572 (7th Cir. 2009).

The Seventh Circuit rejected similar logic in *Box*, where a railroad claimed that a state requirement for the installation of walkways parallel to train tracks was preempted. *Id.* at 571-72. The railroad cited several regulations governing track construction and argued that they "covered" the subject matter of the state requirement. *Id.* at 572. But although federal regulations provided detailed guidance for the construction of

"roadbed" and "track safety standards," none "deal[t] with walkways." *Id.* at 572-73. The court found that, under the railroad's argument, the preemption provision's second sentence—which allows states to adopt railroad safety regulations until the Secretary of Transportation acts on the matter—would be "self-defeating:" "Instead of providing a division between state and federal spheres (in which the state rule prevails unless a federal rule covers the topic), the sentence would effectively read: 'All state laws and regulations related to railroad safety and security are preempted.'" *Id.* at 573. And because the FRSA says nothing of the sort, the court declined to interpret regulations addressing roadbed construction as also covering parallel walkways. *See id.* ("The rules for roadbed construction and maintenance do not 'cover' the subject of adjacent walkways."). So too, here. Without a federal regulation that "covers" debris removal on a railroad's property beyond its tracks or the area "immediately adjacent to the roadbed," the Court is not convinced that Illinois' negligence framework has been preempted. Defendants may reassert an FRSA preemption argument after the close of discovery.

4. Duty

Defendants' final argument contends that the Kellers failed to plead a recognized duty under Illinois law. Specifically, they claim that the complaint offers only undefined "duties" to "communicate" with local authorities, and to "inspect," and "maintain" their property. This argument is more simply rejected because Illinois *does* recognize certain duties that are sufficiently pled to survive a motion to dismiss.

Illinois has long recognized that "every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and

foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1097 (Ill. 2012) (quoting *Widlowski v. Durkee Foods, Div. of SCM Corp.*, 562 N.E.2d 967, 968 (Ill. 1990)). "Thus, if a course of action creates a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury." *Id.* There can be no serious debate that Defendants are subject to this general duty of ordinary care, like everyone else in Illinois.

But Defendants are also subject to an important duty as landowners. "At common law, a landowner bears a duty not to increase the natural flow of surface water onto the property of an adjacent landowner." *Van Meter v. Darien Park Dist.*, 799 N.E.2d 273, 279 (Ill. 2003). The complaint invokes precisely this duty. It alleges that (i) debris on Defendants' property "substantially impeded the creek's natural flow;" (ii) this condition caused the accumulation of water, which ultimately flooded of the Kellers' property; and (iii) Defendants, through their acts or omissions, breached their "duty to prevent the unnatural accumulation of water on their property." The fact that certain alleged "duties" in the complaint have not been recognized in their exact form by the Illinois Supreme Court does not change the fact the complaint sufficiently alleges a duty that *is* recognized under Illinois law. At this stage of the case, that is all that is required.

## CONCLUSION

For these reasons, Defendants' motion to dismiss Plaintiff's complaint (Doc. 13) is **GRANTED in part** and **DENIED in part**. Count I of Plaintiffs' complaint is **DISMISSED**

**without prejudice**.

Because Plaintiffs filed a consolidated complaint and only Caseyville's claim is now dismissed, Caseyville has two options: (1) it may file an amended consolidated complaint with the Kellers in which it amends only its claims against Defendants; or (2) it may file a separate amended complaint on its own behalf. Whichever option Caseyville chooses, its amended complaint is due on or before **October 9, 2025**.

**IT IS SO ORDERED.**

**DATED: September 9, 2025**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**